THE ZEROPACK COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Zeropack Co. v. Commissioner
Docket No. 20515-80.
United States Tax Court
T.C. Memo 1983-652; 1983 Tax Ct. Memo LEXIS 132; 47 T.C.M. (CCH) 181; T.C.M. (RIA) 83652; October 27, 1983. Aubrey J. Owen, for the petitioner. Carolyn M. Parr, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in corporate income taxes of petitioner the Zeropack Company for its fiscal years ended June 30, 1977 and June 30, 1978, in the respective amounts of $286,999.21 and $19,223.04. Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for decision the portion of the $2.8 million paid by petitioner to acquire the assets of another corporation allocable to the inventories of frozen fruits purchased. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The Zeropack Company [1] (petitioner), a corporation incorporated under the laws of the State of Virginia, maintained its principal place of business in Winchester, Virginia, at the time of the filing of its petition in this case. Petitioner filed Federal income tax Returns for its fiscal years ended June 30, 1977, and June 30, 1978, with the Internal Revenue Service Center, Memphis, Tennessee. *134 Old Zeropack was incorporated in Ohio in 1933. It engaged in the business of selling processed frozen fruit to commercial users. Approximately 65 percent of its sales were to the producers of such products as ice cream, pies, preserves, etc., and the remaining 35 percent of its sales were to restaurants, hotels, hospitals and other institutions. The company maintained its headquarters in Cincinnati, Ohio, although its processing plant was located in Winchester, Virginia. Old Zeropack processed its own frozen apples and peaches in its Winchester plant. Most of the apples it processed were grown in the Winchester area. Old Zeropack additionally purchased a variety of other types of fruit from other processors to offer for resale to its customers. Old Zeropack leased all of the buildings and almost all of the equipment which it used in conducting its business operations. The company's *135 Winchester plant was leased from a Virginia corporation called the C.L. Robinson Corporation. The leased facilities in Winchester included not only the processing plant but storage facilities for raw fruit and for processed frozen fruit. The bulk of the company's storage for frozen fruit was in Winchester, although the company also stored its frozen fruit in a number of commercial warehouses in different cities in the Midwest and the South. Since the time of its incorporation, the products offered by Old Zeropack have had a reputation among commercial users as being frozen fruit meeting a high standard of quality. The company placed its registered trademark "Zeropak" on all of the lids or labels of the frozen fruit products which it sold. The company did no public advertising since it sold exclusively to commercial users. The only advertising done by the company took place at broker's conventions. The company made approximately 60 percent of its sales through food brokers and the other 40 percent through direct sales. An individual named Rudolph A. Rasche had owned 100 percent of the stock of Old Zeropack. Mr. Rasche died on February 26, 1966. His will provided that his *136 shares in the company be placed in a testamentary trust. The will further directed that the trustees of this trust sell the company no later than 10 years after the date of Mr. Rasche's death. Upon sale of the company, the sales proceeds were to be distributed to certain charitable beneficiaries. The will further contained an in terrorem clause which provided for the disinheritance of any beneficiary who contested its terms. Following Mr. Rasche's death, the shares were placed in trust pursuant to the provisions of his will. The trustees operated the company from the date of Mr. Rasche's death until its sale. In conducting the business operations of Old Zeropack, the trustees relied heavily on Layton H. Stockdale, a long-time employee of the company in Winchester, Virginia. Mr. Stockdale had extensive experience in running the company's business, and the trustees placed him in charge of day-to-day operations. Mr. Stockdale also played a large role in formulating and making major management decisions, as the trustees, as well as the directors of the company, generally were inclined to defer to his judgments regarding the management of the business. On March 29, 1971, Old *137 Zeropack and C.L. Robinson Corporation entered into an agreement granting the company certain options regarding renewals of its lease of the Winchester plant. While the original lease then in effect was to expire on September 30, 1974, the option agreement granted Old Zeropack the right to renew the lease for an additional term of 1-1/2 years to March 31, 1976. Upon such renewal, the company would be given the further option of renewing the lease for an additional term of between 1 year to 3-1/2 years. The trustees exercised both of these renewal rights, but renewed the lease for a second term of only 1 year, to March 31, 1977. The trustees at the time of the second renewal mistakenly believed they would still be allowed further renewals up to a maximum of 3-1/2 years. Also, while at least one of the charitable beneficiaries had expressed an interest in having the trust continue to operate Old Zeropack, another of the chairtable beneficiaries had insisted that the trust sell the company within the 10-year period directed by the will. As of the beginning of 1976, the trustees were engaged in negotiations with several potential purchasers. One of the parties expressing an interest *138 in purchasing Old Zeropack was C.L. Robinson Corporation. In February of 1976, C.L. Robinson Corporation made an offer to buy the operating assets of Old Zeropack for a price of $2.5 million, with such price being paid by a downpayment of $500,000 and the balance over a 2- or 3-year period. This offer was rejected by the trustees since they considered it too low. One of the trustees, who took an active role in the negotiations being conducted, had initially been of the opinion that the business of Old Zeropack, exclusive of the large amount of cash in the corporation which the trust would retain, was worth approximately $3.5 million. The trustees and their representatives had also wanted the transaction to be structured as a purchase of the stock of Old Zeropack, rather than as a purchase of its assets. H. Delmer Robinson, the president of C. L. Robinson, in April or early May of 1976, announced that the lease for the Winchester plant would not be extended after its termination on March 31, 1977. The trust had no further options to renew the lease, and Mr. Robinson stated that he would not grant any additional extensions. During the period of time when negotiations were *139 being conducted with various potential purchasers, there were no other facilities comparable to those leased by Old Zeropack from C.L. Robinson Corporation available in the Winchester, Virginia, area. It was therefore important for any potential purchaser of Old Zeropack to acquire the right to use the Winchester plant. When it became clear that the lease would not be extended, potential purchasers, with the exception of C.L. Robinson Corporation, lost interest in acquiring Old Zeropack. C.L. Robinson Corporation, by letter dated May 19, 1976, proposed that it would buy either all the outstanding shares of stock or the operating assets of Old Zeropack for a price of $2.8 million. Such pruchase price was arrived at based on an estimated book value of $1,908,710 for the assets as of June 30, 1976, plus an $891,290 premium. The proposal contemplated that the trust would either retain or withdraw all of the approximately $1.7 million in cash Old Zeropack had accumulated. However, to the extent the book value of the operating assets did not total $1,908,710, cash would have to be given to the buyer to make up the deficiency. This proposal was also contingent on the trust agreeing *140 to finance the purchase. The letter proposed that the purchase price be paid over a 5-year period, with $400,000 being paid in the first year and $600,000 in each of the following 4 years. At about this time, Mr. Robinson and Richard L. Boxwell, Jr., another employee of C. L. Robinson Corporation taking part in the negotiations, approached Mr. Stockdale about his joining them in the operation of the frozen fruit business they anticipated conducting following an acquisition of Old Zeropack or its operating assets. Mr. Robinson and Mr. Boxwell needed to obtain Mr. Stockdale's services because they had no experience in conducting a frozen fruit business. Mr. Stockdale was agreeable since he wished to continue to be actively employed and did want the business of Old Zeropack to continue to be carried on. On May 28, 1976, petitioner was incorporated for the purpose of continuing the negotiations previously carried on by C. L. Robinson Corporation. Mr. Stockdale, Mr. Robinson and Mr. Boxwell were the incorporators and each on May 28, 1976, received the following number of shares of stock in petitioner in return for contributing the cash amounts indicated below: Individual
Cash Contributed
Shares Received
Mr. Stockdale
$5,000
500
Mr. Robinson
2,500
250
Mr. Boxwell
2,500
250
*141 It was anticipated that the shares issued to these three individuals would represent only a small percentage, 8 percent or so, of the shares to be issued by petitioner if the negotiations proved successful. C. L. Robinson Corporation, in return for transferring the Winchester plant leased to Old Zeropack, plus five orchards and certain cold storage facilities in West Virginia, would receive the other approximately 92 percent of the shares. It was also understood that Mr. Stockdale would become petitioner's president at the same level of compensation he received from Old Zeropack and would be so employed for a specific number of years. The trustees and the directors of Old Zeropack were aware of Mr. Stockdale's involvement as a shareholder in petitioner. During the negotiations between petitioner and Old Zeropack, Mr. Stockdale, the trustees and the directors of Old Zeropack represented Old Zeropack. Mr. Robinson and Mr. Boxwell represented petitioner. In early June of 1976, the trustees indicated their disapproval as to the suggestion that the proposed transaction be structured as a purchase of the assets of Old Zeropack by petitioner. The trustees realized that Old Zeropack *142 might incur tax liability upon a sale of assets under section 1245. [2] The trustees were particularly concerned as to potential tax liability under section 1245 with respect to the bulk bins owned by Old Zeropack. Old Zeropack, for tax purposes, had consistently treated such bins as being inventory and had not on its returns claimed any depreciation with respect to the bins. The individuals negotiating on behalf of petitioner, on the other hand, came to realize that it could well be to its disadvantage to acquire the stock of Old Zeropack rather than that company's assets. Petitioner was advised by its attorney that if it continued to operate Old Zeropack following an acquisition of its shares, Old Zeropack would continue to have the same tax bases in the assets which it owned. The attorney further advised that petitioner would also bear any liability Old Zeropack had under section 1245 if it, following its acquisition of the shares, chose to liquidate Old Zeropack under the provisions of section 334(b)(2). See section *143 1.1245-4(c)(3), Income Tex Regs. The individuals negotiating on behalf of petitioner subsequently informed the trustees that, if the proposed transaction was structured as a stock purchase, they intended to liquidate the corporation under section 334(b)(2) but would accordingly reduce the overall purchase price to take into account any potential recapture liability petitioner might bear following a liquidation of Old Zeropack. The trustees, as a result of these discussions, concluded that, regardless of whether the transaction was structured as a stock purchase on an asset purchase, the trust would bear the potential liability for recapture, either directly as a transferee after itself liquidating Old Zeropack following a sale of its assets or indirectly by way of receiving a lesser purchase price for the stock. The trustees decided that, under these circumstances, they would rather take their chances with respect to the trust incurring recapture liability on the bulk bins. Even previous to arriving at these conclusions, the trustees had decided that if the transaction was structured as a sale of the assets, whey would sell the assets in compliance with section 337. The trustees, *144 however, were advised that section 337 would not afford Old Zeropack tax-free treatment on the sale with respect to any recapture liability. See section 1.1245-6(a) and (b), Income Tax Regs. See further, section 1.1245-4(d)(4), Income Tax regs. At least by early July of 1976, the representatives for Old Zeropack realized that they might well have to acquiesce to the transaction being structured as a purchase by petitioner of the assets of Old Zeropack, the terms of which would be substantially similar to those contained in the proposal made by C.L. Robinson Corporation in the May 19, 1976, letter. The overall purchase price for the assets would be $2.8 million, payable by petitioner over a 5-year period. At about this time, both sides realized that the amounts of the overall purchase price to be assigned to the various assets had yet to be worked out. The two sides then planned a meeting on July 30, 1976, at which the amounts to be allocated could be discussed. Prior to such meeting, the representatives for petitioner were asked to give the representatives of Old Zeropack their proposals as to the amounts of the allocations. At such meeting petitioner's proposed allocations *145 were discussed. Petitioner proposed that an amount equal to $12.40 per bin be allocated to the bulk bins, $100,000 to the tangible assets and $10,000 to the intangibles, which included the name "The Zeropack Company", the trademark, trade names, trade secrets, customer lists and sales and purchase records. Both sides, while realizing that actual closing might occur several months later, agreed that their agreement would treat the sale as being effected as of August 31, 1976. Mr. Stockdale was asked to value Old Zeropack's inventories of fresh fruit and processed frozen fruit as of August 31, 1976. Mr. Stockdale arrived at a valuation of $1,771,487 for the fruit, and this valuation formed the basis upon which petitioner proposed that $2,189,651 of the purchase price be allocated to "inventories" by the purchase agreement. Mr. Stockdale arrived at the $1,771,487 valuation of the fruit by valuing it at prices which could be realized for the fruit in sales to customers in the ordinary course of business. He valued the different fruits in the inventory by taking into account original costs, refrigeration charges, investment costs, overhead, the possibility of selling price increases, *146 available supply, demand for the products and general market conditions. The individual values which he placed on the different fruits were substantially identical to those prices quoted by petitioner to customers in a price list dated September 1, 1976. This price list had been prepared some time in October, but the prices quoted were effective as of September 1. The trustees and their representatives did not make any proposals as to the allocations to be made in the purchase agreement. They accepted all of the allocations proposed by petitioner's representatives and did not negotiate over the amounts proposed. On October 25, 1976, petitioner and Old Zeropack entered into an agreement effective as of August 31, 1976, under which petitioner purchased the assets of Old Zeropack for a price of $2.8 million. The agreement allocated the following amounts of the purchase price to the following specified categories of assets: Assets
Amount
Cash
$ 128,093
Accounts Receivable
355,963
Inventories *
2,189,651
Prepaid Expenses
16,241
Investment--Red Cheek, Inc.
52
Intangibles **
10,000
Fixed Assets
100,000
$2,800,000
*147 The $2,189,651 allocation in the agreement to "inventories" was based on the following values being assigned to the items included in "inventories": Manufacturing Supplies
$ 35,133
Bulk Bins
377,931
Pallets
5,100
Fruit
1,771,487
$2,189,651
Respondent in his notice of deficiency decreased petitioner's claimed basis in the merchandise inventory it purchased from Old Zeropack Company, giving the following explanation: Of the total purchase price of $2,800,000 paid to acquire the business of The Zeropack Company, $590,076 was for going concern value, goodwill or other intangibles having an indeterminate useful life rather than $10,000 as shown on your returns for the years ended June 30, 1977 and June 30, 1978. Therefore your basis in the merchandise inventory purchased from The Zeropack Company and the deductions claimed for cost of goods sold *** are reduced and taxable income increased *** The statutory notice further showed the following computations as to the adjustments to be made to cost of goods sold: June 30, 1977
June 30, 1978
Basis of initial merchandise inventory
included in Cost of Goods Sold
$1,704,906
$66,581
Corrected basis of initial merchandise
inventory sold
1,169,789
48,937
Adjustment to Cost of Goods Sold
$ 535,117
$17,644
*148 The $1,218,726 figure ($1,169,789 plus $48,937) determined by respondent to be petitioner's basis in the initial merchandise which it acquired from Old Zeropack was Old Zeropack's cost basis in such merchandise. On brief respondent contends, based on the testimony of a witness he offered as an expert, that the intangibles were undervalued by only $291,998, of which $290,727 resulted from overvaluation of inventory. [3]
Respondent and petitioner have agreed that any adjustment to petitioner's cost of the fruit it acquired from Old Zeropack would result in 97 percent *149 of the adjustment being made to petitioner's cost of goods sold for its fiscal year ended June 30, 1977, and the remaining 3 percent of the adjustment being made to petitioner's cost of goods sold for its fiscal year ended June 30, 1978. OPINION The sole issue in this case is the proper amount of the purchase price paid by petitioner in acquiring the assets of Old Zeropack to be allocable to the frozen fruit inventory acquired. [4] Petitioner contends that the allocation of purchase price made in its purchase agreement should be respected and that the $1,771,487 amount at which Mr. Stockdale appraised the fruit should be determined as its cost for the fruit. Petitioner, in support of its contention, argues that no goodwill or going-concern value or other intangibles of a value in excess of $10,000 were acquired by it. *150 It is respondent's position that in addition to the assets enumerated in the purchase agreement, petitioner acquired substantial goodwill or going-concern value in the transaction. Respondent contends that the $1,771,487 figure for the fruit acquired is artificial and unrealistic and that the allocations made in the purchase agreement with respect to "inventories" and "intangibles" were not arrived through arm's-length negotiations between parties with interests adverse to one another. First, we will consider the contention of petitioner that since respondent is challenging the allocation made in the purchase agreement, he must show by "strong proof" that the allocation is in error and that it does not comport with economic reality. Under petitioner's view of the applicable law, it is respondent who must show by "strong proof" that his contended-for allocation was intended by the parties to the purchase agreement and that such allocation has some independent basis in fact or business reality. Petitioner, in our view, misunderstands the law as applicable to the facts here present. Respondent was not a party to the purchase agreement entered into by petitioner and Old Zeropack. *151 We do not, therefore, have a situation where a taxpayer is seeking to have an allocation made that differs from that contained in the agreement he previously entered into with another party. Further, it is well established that generally the determination made by respondent in his notice of deficiency bears a presumption of correctness and that the burden of showing to the contrary is upon petitioner. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Thus, the fact that respondent disputes the allocation made in the purchase agreement does not place upon him the burden of proof. Petitioner's reliance on the decision in General Insurance Agency, Inc. v. Commissioner,401 F.2d 324 (4th Cir. 1968), affg. a Memorandum Opinion of this Court, as standing for such a proposition is misplaced. Buffalo Tool & Die Manufacturing Co. v. Commissioner,74 T.C. 441, 446-447 (1980). [5]
*152 Turning to the issue presented, we do not agree with petitioner's contention that it acquired no goodwill or going-concern value in the transaction. The record clearly shows that substantial goodwill and going-concern value was acquired by petitioner and that the value of the intangibles acquired was greatly in excess of the $10,000 allocated to intangibles. This Court is not bound by the allocations made in petitioner's purchase agreement. That the agreement does not specifically mention the transfer of any goodwill or going-concern value is not controlling. Copperhead Coal Co. v. Commissioner,272 F.2d 45, 48 (6th Cir. 1959), affg. a Memorandum Opinion of this Court; Concord Control, Inc. v. Commissioner,78 T.C. 742, 745 (1982); Sherwood Block Co. v. United States,332 F.Supp. 271, 273 (S.D. W.Va. 1971). The question of whether goodwill exists is to be determined from the particular facts and circumstances of this case. Miller v. Commissioner,333 F.2d 400, 404 (8th Cir. 1964), affg. 39 T.C. 940 (1963); Solitron Devices, Inc. v. Commissioner,80 T.C. 1, 17-18 (1983), on appeal *153 (11th Cir., Apr. 8, 1983). As we noted in Solitron Devices, Inc. v. Commissioner,supra at 18-- Goodwill exists where there is an "expectancy of both continuing excess earning capacity and also of competitive advantage or continued patronage." Wilmot Fleming Engineering Co. v. Commissioner,65 T.C. 847, 861 (1976). More succinctly, it has been described as the probability that "old customers will resort to the old place." Metallics Recycling Co. v. Commissioner,79 T.C. 730 (1982); Brooks v. Commissioner,36 T.C. 1128, 1133 (1961); see also Miller v. Commissioner,56 T.C. 636, 649 (1971). The indicia of goodwill are numerous and include practically every imaginable trait that has a positive bearing on earnings. As we further noted in such case, there may be an overlap between "goodwill" and "going-concern value," so much so that in some cases the two attributes have not been distinguished. We have defined going-concern value to be that "additional element of value which attaches to property by reason of its existence as an integral part of a going concern," and stated that such value *154 is manifested by the ability of the acquired business to continue generating sales without interruption during and after acquisition. Solitron Devices, Inc. v. Commissioner,supra at 19-20. See Concord Control, Inc. v. Commissioner,supra at 746; VGS Corp. v. Commissioner,68 T.C. 563, 592 (1977). Under the purchase agreement, petitioner specifically obtained the right to the name "The Zeropack Company" and also to the registered Zeropak trademark. Old Zeropack had a longstanding reputation among commercial users of frozen fruit for offering frozen fruit of high quality. Such a reputation was of considerable benefit to Old Zeropack in selling its products. The company did no public advertising since it only sold to commercial users. The only advertising done by it was done at food conventions. While it is possible to have frozen fruit graded as meeting a specified United States Department of Agriculture (USDA) standard, grading adds significantly to the processing cost and to the price to the commercial user. Mr. Stockdale, who managed the day-to-day business operations for both Old Zeropack and later for petitioner, *155 so testified.He further testified in effect that, except for the particular customer who had a special need for fruit that was graded, most of the company's customers would be better off purchasing fruit that was ungraded but which from prior experience could be expected to be of the quality which would suit their needs. The commercial users to whom Old Zeropack and petitioner would sell in many cases would not require fruit that was USDA graded. As to those customers purchasing the frozen fruit to be used in producing other food products such as ice cream, pies and fruit preserves, the use of graded fruit would in most instances definitely be uneconomical and commercially unjustified. The same would also be true as to the institutional users such as hotels, careterias and restaurants, who purchased the frozen fruit to be used in the preparation of meals to be offered by them. The right to use the name "The Zeropack Company" because of the reputation Old Zeropack had established for Zeropak products, therefore, conferred a business advantage on petitioner. Potential customers recognized that name. Petitioner's use of it allowed petitioner to take advantage of Old Zeropack's longstanding *156 reputation for offering quality products. Petitioner clearly acquired substantial goodwill in the transaction, and we so hold. Additionally, we find petitioner in the transaction also acquired going-concern value. Petitioner in essence was continuing the business carried on by Old Zeropack. The purchase agreement provided that petitioner was to be given all of Old Zeropack's customer lists and sales and purchase records. The record in this case further shows that while the purchase agreement did not require it to honor the sales contracts entered into by Old Zeropack, petitioner readily did so. Petitioner sold the fruit to former customers of Old Zeropack even though the contract prices at which it sold the fruit were, in most instances, lower than the prevailing open market prices. Obviously, petitioner believed that it would be more beneficial to honor the contracts and encourage such former customers of Old Zeropack to continue to give their business to petitioner. Petitioner here acquired an established business. Petitioner intended to, and did, continue to carry on such business without interruption following its acquisition. We conclude that petitioner acquired substantial *157 going-concern value in its purchase of the Old Zeropack assets. Such goodwill and going-concern value, which were not mentioned in the agreement, clearly had an actual value well in excess of the $10,000 figure allocated in the agreement to "intangibles." While the allocations made in petitioner's purchase contract are relevant and should be considered in determining the values of the assets it acquired, such allocations need not be respected if they are artificial and unrealistic. Buffalo Tool & Die Manufacturing Co. v. Commissioner,supra at 446-447; F. & D. Rentals, Inc. v. Commissioner,44 T.C. 335, 345-346 (1965), affd. 365 F.2d 34 (7th Cir. 1966). This record is completely clear that the $1,771,487 value placed on the fruit is an unrealistic value for the fruit inventories in an acquisition of the type made by petitioner. Petitioner purchased all of the operating assets of Old Zeropack, including its entire inventories of frozen fruit. An expert witness who testified for respondent was of the opinion that a purchaser of the inventories in bulk would not pay an amount equal to that which could be realized for the frozen *158 fruit if it were sold in the ordinary course of business. We fully agree. A purchaser in a bulk sale would not pay a price which he would expect to result in the realization of no profit on his resale of the goods. [6] The purchase agreement allocated such an artificially high value to "inventories" only because an equally low artificial value was placed on "intangibles." *159 Moreover, another compelling reason for disregarding the values contained in the purchase agreement is that the parties did not have adverse interests with respect to the amounts allocated to fruit "inventories" and to "intangibles." Since Oil Zeropack intended to sell its assets pursuant to the provisions of section 337, it was a matter of indifference to it that the purchase agreement assigned a high value to the fruit inventories and nothing to goodwill or going-concern value. Section 337 would afford Oil Zeropack nonrecognition of any gains or losses it had on its sale of such assets. See sections 337(a) and 337(b)(2). Thus, as the representatives for the trust and for Oil Zeropack testified, they simply agreed to the allocations proposed by petitioner and did not attempt to negotiate over the amounts petitioner proposed by allocated by the agreement respective to "inventories" and "intangibles." These representatives had at such time accepted the fact that all its operating assets would be sold to petitioner for a total purchase price of $2.8 million. The trustees, moreover, were under significant pressure to conclude an agreement because of the impending expiration of Oil *160 Zeropack's Winchester lease and the directive contained in Mr. Rasche's will that the corporation be sold within 10 years after his death. [7] While the parties had adverse interests concerning the overall purchase price and arrived at the total $2.8 million amount through arm's-length bargaining, their interests were not adverse concerning any allocations made with respect to the fruit inventories and goodwill and going-concern value. Such being the case, the value placed on the fruit inventories by the contract is not a fair or reliable indication of their true value and should be disregarded. Concord Control, Inc. v. Commissioner,supra at 745. [8]
*161 Respondent's expert witness was a valuation engineer who had been employed with the Internal Revenue Service for 10 years. In his employment, the witness has received assignments to appraise real property and items of tangible and intangible property held for commercial and industrial use. This witness gave an opinion that the frozen fruit inventories in the type of acquisition made would have a value of $1,396,547. This witness acknowledged that he possessed nowhere near the experience or expertise of Mr. Stockdale in the frozen fruit business. However, as discussed above, this witness stated that no knowledgeable purchaser in a bulk sale would pay the seller the retail value of the inventory. We were favorably impressed with this witness's expertise and the logic of his testimony. In making his valuation, the witness considered what could be expected to be realized for the frozen fruit if it were sold in the ordinary course of business. The witness used the September 1, 1976, price list containing the prices which petitioner quoted to its customers to compute the sales proceeds that could be estimated from sales of the acquired inventories. Assuming all of the frozen fruits *162 were sold at the prices quoted in the list, there would be gross sales totaling $1,698,155. Next, the witness in his report considered the annual gross profits and associated overhead and selling expenses of Old Zeropack in the 7-year period prior to the sale. This data which he obtained from Old Zeropack's income tax returns indicated that the company in such period realized an annual average gross profit of 17 percent on its sales of fruit and incurred average associated overhead consisting of selling and administrative expenses equal to 10.4 percent of annual sales. On applying the 17 percent average profit margin to the estimated sales figure, the witness arrived at the $288,686 amount of estimated gross profit which a seller of such inventory would realize. The witness, in the report, decided that such gross profit inherent in the inventory would be shared between the purchaser and the seller in a bulk sale, and determined that $125,000 of the $288,686 total gross profit would be a reasonable amount for petitioner to receive. [9] To arrive at a reasonable price which a purchaser in a bulk sale would pay for the inventories, the $125,000 of reasonable profit plus an amount *163 of $176,608, representing the 10.4 percent of estimated operating and selling expenses, was subtracted from the estimated $1,698,155 sales figure. Thus, in his report the witness concluded that Old Zeropack's frozen fruit inventories in a bulk purchase would have a value of $1,396,547. *164 The approach used by respondent's witness is a reasonable one. Any purchaser in bulk would definitely consider how much he could sell the purchased inventory for and the amount of expenses he would incur in selling the inventory. Undoubtedly, the projected sales and projected expenses would be the primary factors in any decision as to the amount to pay for the bulk inventory. Further, since petitioner would in essence merely continue to carry on Old Zeropack's business, the actual financial history of Old Zeropack in conducting its business in the years prior to the sale would be the best data on which to base such projections. We are satisfied that the witness's opinion of the fruit's value was arrived at through a well-thought-out and sensible process of appraisal. We accept the opinion of respondent's expert witness and find that the frozen fruit inventories which petitioner acquired from Old Zeropack had a value, and therefore a cost to it, of $1,396,547. We also conclude that the $290,727 excess value placed by petitioner on the frozen fruit inventory is properly allocable to goodwill and going-concern value acquired by petitioner from Old Zeropack. Decision will be *165 entered under Rule 155.
Footnotes
1. As part of petitioner's acquisition of the assets of the other corporation, it acquired the right to use the name "The Zeropack Company." Since the selling corporation had previously been known by that name, the term "Old Zeropack" is used in this opinion to refer to the selling corporation.↩
2. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue.↩
*. As used in the agreement, the term "inventories" included manufacturing supplies, bulk bins, pallets and the fresh and frozen fruit. ** The intangibles listed as acquired in the agreement included trademark, trade names, trade secrets, customer lists, sales and purchase records, and the name "The Zeropack Company."↩
3. Respondent, based on the testimony of his witness, uses a total inventory of $1,898,924 rather than the $2,189,651 inventory used by petitioner, resulting in the $290,727 reduction. The $1,898,924 inventory is computed as follows: Inventory of frozen fruits
$1,396,547
Other items accepted at petitioner's
valuation as follows: Finished goods
10,453
Raw materials (fresh fruits)
71,379
Bins
377,931
Pallets
5,100
Manufacturing supplies
37,514
Total
$1,898,924
The remaining increase of $1,271 of the amount allocated to intangibles results from an adjustment agreed to by the parties.↩
4. The parties are in agreement as to the amounts of the purchase price which should be allocated to cash, accounts receivable, prepaid expenses, the investment in Red Cheek, Inc., and the finished goods, raw materials, manufacturing supplies, bulk bins and pallets inventory. The issue in the instant case has therefore been narrowed down to the proper allocation to the frozen fruit inventories and its effect, if any, upon the allocation to intangibles. The argument of each party with respect to the allocation to intangibles recognizes that if in fact there is an overvaluation of inventories, it follows that the excess value is allocable to intangibles. Their arguments over the value of the intangibles are merely supportive of their respective positions as to value of inventories.↩
5. This is not to say that the allocation made in the contract is irrelevant. It should be considered, and if the allocation was reached pursuant to arm's-length bargaining and has some independent basis in fact or business reality, it should generally be upheld unless it is artificial and unrealistic. Buffalo Tool & Die Manufacturing Co. v. Commissioner,74 T.C. 441, 446-447↩ (1980).
6. Petitioner argues that it subsequently did derive some profit with respect to the purchased inventory, even using $1,771,487 as its cost for such inventory. Petitioner therefore contends that such cost figure, upon which the allocation made by the agreement was based, was realistic, especially in light of the fact that because of a freeze which occurred in the Winchester area earlier in 1976 there would be a shortage of apples. However, the record is completely clear that Mr. Stockdale arrived at the $1,771,487 figure by valuing the inventory as of August 31, 1976, at an amount equal to that which he anticipated would be realized for the frozen fruits by petitioner in sales in the ordinary course of business. Additionally, in pricing the different fruits it is stipulated that he considered such factors as the available supply and anticipated demand. Moreover, these prices, upon which Mr. Stockdale based his $1,771,487 valuation, were substantially identical to the prices for the fruit which petitioner quoted to its customers in its September 1, 1976, price list.↩
7. Thus, the record presented does not support the alternative contention raised by petitioner in its petition that any adjustment to its cost for the fruit inventories represented the payment of a premium to Oil Zeropack for the cancellation of the remaining period of its existing lease for the Winchester premises. As of May 1976, the lease had less than 10 months to run, so it is highly doubtful anyone would pay a premium to acquire the right to use the premises subject to the lease for such a short duration. Moreover, considering the strength of their relative bargaining positions, neither was Old Zeropack in a position to demand the payment of such a premium from petitioner. ↩
8. See also Black Industries v. Commissioner,T.C. Memo. 1979-61↩.
9. This figure may be somewhat conservative considering the strong bargaining position of petitioner. Old Zeropack was under considerable compulsion to sell its business. A purchaser of either its business or inventory in bulk would be in a position to drive a very hard bargain. Also, since C.L. Robinson Corporation owned the premises in which most of such inventory was stored, petitioner, unlike a third party, would not incur any moving costs for the purchased inventory. However, to the extent the $125,000 of the estimated gross profit given to petitioner by the expert may be on the low side, the estimated expenses associated with the purchased inventory are probably high. Some of the expenses, since petitioner was taking over in mid-year effective September 1, 1976, undoubtedly already had been incurred by Old Zeropack.At any rate, the low figure determined by the expert as petitioner's share of the anticipated profits inherent in the inventory offsets his somewhat high estimated expense figure.↩